AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Gabriel Alexis RODRIGUEZ-TORRES, and<br>Miguel TRONCOSO,<br><br>*Defendant(s)* | )<br>)<br>) Case No. 13-8213-WM<br>)<br>)<br>) |

FILED by ___ D.C.
APR 1 9 2013
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __04/09/2013 - 04/19/2013__ in the county of __Palm Beach__ in the __Southern__ District of __Florida and elsewhere__, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846 | Conspiracy to Possess with Intent to Distribute Five (5) Kilograms or More of Cocaine. |

This criminal complaint is based on these facts:

See attached affidavit of DEA Special Agent David Weeks.

☑ Continued on the attached sheet.

*Complainant's signature*

DEA Special Agent David Weeks
*Printed name and title*

I find probable cause: Sworn to before me and signed in my presence.

Date: __04/19/2013__

*Judge's signature*

City and state: __West Palm Beach, Florida__   U.S. MAG JUDGE, WILLIAM MATTHEWMAN
*Printed name and title*

## **AFFIDAVIT**
Case No. 13-8213-WM

Your affiant, David Weeks, first being duly sworn, does hereby depose and state as follows:

1. I am a Special Agent of the Drug Enforcement Administration (DEA) assigned to the Miami, Florida Field Division, West Palm Beach Resident Office, and have been so employed since February of 2010. As such, I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516(1). I have received training on the subject of narcotics trafficking and money laundering from the DEA and have been personally involved in investigations concerning the possession, manufacture, distribution, transportation and importation of controlled substances, as well as methods used to finance drug transactions and launder drug proceeds.

2. Prior to my employment with the DEA, I was a police officer for the City of West Palm Beach Police Department (WPBPD), and had been so employed since April of 1997. During my last nine years with the WPBPD, I was assigned to the Special Investigations Division, and from there assigned to a money laundering task force and to the DEA Task Force. During that time, I was tasked with the responsibility of investigating money laundering and narcotics related crimes. As a law enforcement officer, I have been involved in over 100 narcotics-related arrests and participated in the execution of over 50 narcotics-related search warrants.

3. This affidavit is submitted in support of a criminal complaint charging Geuri Miguel TRONCOSO and Gabriel Alexis RODRIGUEZ-TORRES a.k.a. "IVANI" with Conspiracy to Possess with Intent to Distribute 5 kilograms or more of cocaine, in violation of Title 21, United

States Code, Sections 841(a)(1), 841(b)(1)(A), and 846. The information contained in this affidavit is based on my own personal knowledge as well as information imparted to me from other law enforcement officers and agents. This affidavit is submitted for the limited purpose of establishing probable cause. As such, it does not purport to describe everything known to your affiant concerning the investigation. The telephone calls and conversations outlined below are not verbatim unless otherwise noted, and are intended as summaries of the conversations. I am personally aware that during his receipt of the wire and electronic communications described below, DEA Task Force Officer (TFO) Rey Paniagua was located in Palm Beach County, and the Southern District of Florida.

4.  On or about April 7, 2013, Task Force Officer Rey Paniagua received information from a Confidential Source, hereinafter referred to as CS, that he/she was aware of an individual who the CS knew who was interested in purchasing 20 kilograms of cocaine. TFO Paniagua instructed the CS to have the individual, hereinafter referred to as "YOLI," provide the CS with a telephone number in order for TFO Paniagua to call him. The CS informed TFO Paniagua that YOLI was utilizing telephone number 829-466-9783 and Blackberry Pin Number 218AC4C0.

5.  On April 9, 2013, at approximately 3:58 p.m., TFO Paniagua placed a telephone call to telephone number 829-466-9783, believed to be used by YOLI. The telephone call was recorded. During that telephone call, YOLI told TFO Paniagua that his brother would be calling TFO Paniagua in a few minutes. YOLI asked TFO Paniagua how his brothers could get in contact with TFO Paniagua. TFO Paniagua told YOLI to give them (that is, YOLI's brothers) the telephone number he was utilizing at present to speak with YOLI. YOLI told TFO Paniagua that his brother would make arrangements to talk to TFO Paniagua in person on behalf of YOLI. YOLI asked TFO

-2-

Paniagua for a Blackberry Pin Number. Before TFO Paniagua could provide YOLI with a Blackberry Pin Number, the call was disconnected.

6. Shortly thereafter on April 9, 2013, at approximately 4:08 p.m., TFO Paniagua received a telephone call from telephone number 857-204-0950. During that call, which was recorded, TFO Paniagua asked the male caller, later identified as Geuri Miguel TRONCOSO, where he (TRONCOSO) was presently located. TRONCOSO told TFO Paniagua that he was at the "B" (referring to Boston, MA). TRONCOSO told TFO Paniagua that he had been instructed by his (TRONCOSO's) brother to call TFO Paniagua, so they (TFO Paniagua and TRONCOSO) could meet. The first call was disconnected and TFO Paniagua called TRONCOSO back utilizing a different telephone number. During the second recorded telephone call, TRONCOSO told TFO Paniagua that he would be traveling to TFO Paniagua's location in South Florida by Thursday, April 11, 2013, to further discuss the price and examine the cocaine. TFO Paniagua suggested that TRONCOSO fly into Fort Lauderdale International Airport, and advised that he (TFO Paniagua) would pick TRONCOSO up at the airport. Prior to ending the telephone call, TRONCOSO asked TFO Paniagua if he had a Blackberry Pin Number they could communicate on. TFO Paniagua provided TRONCOSO with his Blackberry Pin Number. Immediately after the call, TFO Paniagua received a Blackberry Message (BBM) advising "Brother, we are in contact."

7. On Wednesday, April 10, 2013, at approximately 1:37 p.m., TFO Paniagua received a BBM advising that he (TRONCOSO) would be arriving around 6:00 PM, because he was unable to get an earlier ticket and that he would send TFO Paniagua a message when he arrived. In response, TFO Paniagua inquired of TRONCOSO whether he needed for TFO Paniagua to pick him up from the airport. TRONCOSO responded that he would appreciate TFO Paniagua meeting him

upon arrival and transporting him to a hotel.

8. On Thursday, April 11, 2013, at approximately 7:17 p.m., TFO Paniagua received a BBM from TRONCOSO advising that they (TRONCOSO and a second male later identified as Gabriel Alexis RODRIGUEZ-TORRES) had arrived.

9. On this same date, at approximately 7:47 p.m., TFO Paniagua, working in an undercover capacity and posing as a cocaine source of supply in South Florida, arrived at the Fort Lauderdale International Airport to pick up TRONCOSO and RODRIGUEZ-TORRES. Your affiant knows the Fort Lauderdale International Airport to be located in Broward County, Southern District of Florida. Upon entering TFO Paniagua's vehicle, TRONCOSO introduced himself as "Geuri" and introduced RODRIGUEZ-TORRES as "Ivani" (phonetic), the brothers of "Joel" from over there (believed to be referring to the subject previously known to TFO Paniagua as "YOLI," who is believed to be residing in the Dominican Republic). TFO Paniagua drove TRONCOSO and RODRIGUEZ-TORRES to a Dunkin Donuts located at 10201 W. Commercial Boulevard, Sunrise, Florida. While en-route to the Dunkin Donuts, TFO Paniagua asked TRONCOSO and RODRIGUEZ-TORRES when they were scheduled to fly back. TRONCOSO told TFO Paniagua that they (TRONCOSO and RODRIGUEZ-TORRES) were scheduled to fly back Saturday morning. TFO Paniagua asked TRONCOSO and RODRIGUEZ-TORRES if they had been working in the drug business for a while. TRONCOSO replied that they have been doing it for a little while, but that his other brother, the one over there (referring to YOLI/Joel) had been doing it for about 12 years. TFO Paniagua asked what country they were from and TRONCOSO advised that they were from the Dominican Republic.

10. TFO Paniagua asked TRONCOSO if they were informed that TFO Paniagua didn't

-4-

have any heroin at this time. TRONCOSO acknowledged. TRONCOSO then asked TFO Paniagua about the quality of the cocaine. TFO Paniagua told TRONCOSO and RODRIGUEZ-TORRES that the quality of the cocaine was good. TFO Paniagua explained to TRONCOSO and RODRIGUEZ-TORRES that he does not break the kilograms of cocaine for street level distribution, but rather only sells them as whole kilograms for wholesale distribution. TRONCOSO responded that they were planning to do the same. TFO Paniagua asked TRONCOSO if he was going to use the cocaine for cooking or snorting. TRONCOSO advised that it was going to be used for cooking. Based on your affiant's training and experience, the term "cooking" in this context, described the process by which cocaine base or "crack" cocaine is manufactured from cocaine hydrochloride, that is, the powder form of cocaine.

11. TRONCOSO asked TFO Paniagua if the kilograms of cocaine would come well sealed because the customers look at it carefully. TRONCOSO told TFO Paniagua that their thing was to work and not to cause any problems. TRONCOSO told TFO Paniagua that the main head of their organization was his brother (referring to YOLI) back in the Dominican Republic, but that the group's representatives here (in the United States) were himself and RODRIGUEZ-TORRES. TFO Paniagua asked TRONCOSO what price they were looking to pay for each kilogram of cocaine. TRONCOSO told TFO Paniagua that the price his brother had been quoted was $29,000 per kilogram. TFO Paniagua told TRONCOSO and RODRIGUEZ-TORRES that the $29,000 price they had been quoted was not going to work for him. TFO Paniagua asked TRONCOSO and RODRIGUEZ-TORRES if they wanted the cocaine delivered to them in Boston or if they were going to come pick the cocaine up in South Florida. TRONCOSO told TFO Paniagua they wanted the cocaine delivered to them in Boston. TFO Paniagua told TRONCOSO that he (TFO Paniagua)

would need to charge more for the cocaine due to the fact that he had to pay someone to transport the cocaine to Boston.

12. TRONCOSO advised TFO Paniagua that once they started working they would want no less than 50 kilograms of cocaine per month. TFO Paniagua asked TRONCOSO how many kilograms they wanted to start with. TRONCOSO advised that his brother had told him that they were going to start with 20 kilograms of cocaine. TFO Paniagua told TRONCOSO that he (TFO Paniagua) was willing to sell them 20 kilograms of cocaine at $29,500 per kilogram, plus an additional $2,000 per kilogram for the delivery (or $590,000 including transport fees). At that time, TRONCOSO told TFO Paniagua that they only had $400,000 available to purchase the cocaine.

13. Upon arriving at the Dunkin Donuts, TFO Paniagua, TRONCOSO, and RODRIGUEZ-TORRES continued to discuss the quantity of kilograms of cocaine and the price they were interested in paying TFO Paniagua for the cocaine. RODRIGUEZ-TORRES asked TFO Paniagua what the price would be if they came down to pick up the kilograms and what the price would be if the kilograms were delivered in Boston. TFO Paniagua told RODRIGUEZ-TORRES that the price would be $2,000 more per kilogram if TFO Paniagua had to transport the cocaine. On the way to the hotel, TFO Paniagua informed TRONCOSO and RODRIGUEZ-TORRES that he wanted to stop by TFO Paniagua's office, to which they agreed.

14. At that time, TFO Paniagua drove to a Sunrise Police Department undercover warehouse, located in the Southern District of Florida. In the warehouse, a Sunrise Police Department Detective, acting in an undercover capacity, was inside the warehouse waiting for TFO Paniagua, TRONCOSO and RODRIGUEZ-TORRES. Once inside the warehouse, TFO Paniagua showed TRONCOSO and RODRIGUEZ-TORRES approximately twenty kilograms of cocaine.

TFO Paniagua invited TRONCOSO to pick out one of the kilograms for him to examine closer. At that time, TRONCOSO grabbed one of the kilograms and proceeded to cut into the cocaine to examine it more closely. TRONCOSO then grabbed a small portion of the cocaine with his fingers. TRONCOSO then smeared the cocaine with his fingers bringing it to his nose and smelling it. TRONCOSO then placed the cocaine on the tip of his tongue. TRONCOSO then grabbed the kilogram of cocaine and gave it back to TFO Paniagua. TFO Paniagua then placed the kilogram back with the other kilograms of cocaine. TFO Paniagua then drove TRONCOSO and RODRIGUEZ to the La Quinta Inn and Suites in Sunrise, Florida.

15. On April 12, 2013, at approximately 3:10 p.m., TFO Paniagua, acting in an undercover capacity, picked up TRONCOSO and RODRIGUEZ at the Sawgrass Mills Mall in the City of Sunrise, Broward County, Southern District of Florida. TFO Paniagua then drove to the Quarterdeck Restaurant located at 12310 W. Sunrise Boulevard, Sunrise, Florida, to further negotiate the cocaine transaction.

16. After going back and forth regarding the price of the cocaine and not coming to an agreement, TRONCOSO asked if TFO Paniagua could BBM his brother. TRONCOSO then provided TFO Paniagua with Blackberry Pin Number 218AC4C0, which is the same Blackberry Pin Number provided by the CS to TFO Paniagua. After negotiating the price over BBM with YOLI, YOLI ultimately agreed to purchase 20 kilograms of cocaine at $30,000 per kilogram, including the transportation fee. TRONCOSO, RODRIGUEZ-TORRES, and YOLI (via BBM) agreed to deposit $20,000 into TFO Paniagua's bank account (an undercover DEA bank account) for the transportation of the kilograms of cocaine from South Florida to Boston, Massachsetts. Upon delivery of the cocaine, TRONCOSO, RODRIGUEZ-TORRES, and YOLI agreed to pay an additional $400,000.

TFO Paniagua agreed that the CS would be responsible for the remaining $180,000 until it was paid by TRONCOSO, RODRIGUEZ, and YOLI. TRONCOSO asked TFO Paniagua when TFO Paniagua would be ready for the delivery of the cocaine. TFO Paniagua told TRONCOSO and RODRIGUEZ that he (TFO Paniagua) would be ready as soon as they (TRONCOSO, RODRIGUEZ-TORRES, and YOLI) were ready and deposited the money into the bank account for the transportation.

17. TRONCOSO then asked TFO Paniagua for the bank account in order to deposit the money. TFO Paniagua told TRONCOSO that he would send it to him at a later time. TRONCOSO told TFO Paniagua that he would prefer writing the bank account information down on a piece of paper and taking it back with him as opposed to receiving via BBM. TFO Paniagua agreed to TRONCOSO's request and provided him with the bank account information.

18. On Monday, April 15, 2013, at approximately 12:09 p.m., TFO Paniagua received a BBM from TRONCOSO, advising that he (TRONCOSO) was working on that so that TFO Paniagua could check on it. TFO Paniagua understood that TRONCOSO was informing TFO Paniagua that he (TRONCOSO) was working on depositing the money into TFO Paniagua's undercover bank account and for TFO Paniagua to check on it.

19. On this same date, your affiant confirmed that two, $6,000 cash deposits had been made into the undercover bank account.

20. On Tuesday, April 16, 2013, at approximately 11:18 a.m., TFO Paniagua received a BBM from PENA-Tejada which stated that it was deposited, referring to the remaining balance for the transportation.

21. On this same date, your affiant confirmed that an $8,000 cash deposit had been made into the undercover bank account. Thus, your affiant notes that as of the date of this affidavit's

-8-

submission, a total of $20,000 has been deposited by the conspirators into the DEA undercover account for purposes of consummating the 20 kilogram cocaine purchase transaction.

22.  WHEREFORE, on the basis of the foregoing, your affiant respectfully submits that probable cause exists to charge Geuri Miguel TRONCOSO and Gabriel Alexis RODRIGUEZ-TORRES for Conspiracy to Possess with Intent to Distribute Five (5) Kilograms or More of Cocaine, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846.

FURTHER YOUR AFFIANT SAITH NAUGHT.

_____
DAVID WEEKS
SPECIAL AGENT
U.S. DRUG ENFORCEMENT ADMINISTRATION

SWORN TO AND SUBSCRIBED BEFORE
ME THIS 19TH DAY OF APRIL, 2013, AT
WEST PALM BEACH, SOUTHERN DISTRICT
OF FLORIDA.

_____
HON. WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE